**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| VICTOR AMBROSIA and BARBARA WEINTRAUB, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br>v.<br><br>PHREESIA, INC.,<br><br>Defendant. | Civil Action No. 1:26-cv-12754<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

On behalf of themselves and all others similarly situated, Plaintiff Victor Ambrosia and Barbara Weintraub complain and allege as follows based on personal knowledge as to themselves, the investigation of their counsel, and information and belief as to all other matters, and demands trial by jury. Plaintiffs believe that substantial evidentiary support will exist for the allegations in this complaint, after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. This case is about upholding the rights of hundreds of thousands of Americans who have never interacted with Defendant Phreesia, Inc. but who have nonetheless had their names, identities, and other personally identifying

information misappropriated and used by Defendant to advertise and promote its own products and services.

2. Defendant has built a lucrative business by misappropriating the names and identities of medical professionals across the United States. Defendant has created, published, and disseminated hundreds of thousands of profile pages, each one of which centers around the personal identity of one medical provider. On each profile page, Defendant uses the name, identity, and personally identifying information of one medical provider to advertise its own products and services.

3. To maximize the revenue it generates from its products and services, Defendant misappropriates the name and identity of nearly every medical provider whose personal information it has amassed in its database to advertise its own products and services—often without asking for, let alone obtaining consent from, any of those individuals.

4. The Illinois Right of Publicity Act ("IRPA") clearly prohibits what Defendant has done.

5. As alleged herein, Defendant has systematically and knowingly used Plaintiffs' and hundreds of thousands of other Americans' names and identities to advertise and promote its own services without those individuals' prior consent.

6. Accordingly, Plaintiffs Ambrosia and Weintraub bring this action, individually and on behalf of the proposed Class defined below, to redress and put a stop to Defendant's violations of the right of publicity.

## PARTIES

7. Defendant Phreesia, Inc. ("Defendant") is a Delaware corporation headquartered in Wilmington, Delaware. Defendant owns and operates the website Medifind.com (the "Website"), where it advertises and sells products and services to persons throughout the United States. Defendant may be served through its registered agent, United Agent Group Inc. 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

8. Plaintiff Victor Ambrosia is a natural person and is a resident and citizen of Cary, Illinois.

9. Plaintiff Barbara Weintraub is a natural person and is a resident and citizen of Glenview, Illinois.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because (i) at least one member of the putative class is a citizen of a state different from the Defendant, (ii) the amount in controversy exceeds $5,000,000 with respect to the putative class, exclusive of interest and costs, and (iii) there are at least 100 members of the putative class.

11. Personal jurisdiction and venue are proper because Plaintiffs Ambrosia and Weintraub are residents and citizens of Cary, Illinois and Glenview, Illinois, respectively, both of which are within this judicial District.

12. Personal jurisdiction is further proper because Defendant intentionally misappropriates the names identities of Illinois residents, targets its advertising on the Website (which misappropriates those names and identities) towards Illinois residents, and sells products and services to Illinois residents and businesses.

13. Defendant knowingly and intentionally misappropriates the names and identities of Plaintiffs and the Class members, knows that Plaintiffs and many of the Class members reside in Illinois, and knows that the resulting harm will be suffered by Plaintiff and those Class members in Illinois.

**ILLINOIS RIGHT OF PUBLICITY ACT**

14. Recognizing the need to protect its citizens' rights of publicity, the Illinois legislature enacted the IRPA to establish a right to control the use of one's name and likeness, among other identifying attributes, in commercial advertising.

15. The IRPA prohibits companies like Defendant from, *inter alia*, using an individual's name or identity to advertise or promote products or services without that person's consent.

16. Specifically, Section 30(a) of the IRPA states, in pertinent part:

> A person may not use an individual's identity for commercial purposes during the individual's lifetime without having obtained previous

> written consent from the appropriate person or persons specified in Section 20 of this Act or their authorized representative.

765 ILCS 1075/30.

17. The IRPA defines "commercial purpose" as "the public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5.

18. The IRPA defines "identity" as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener, including but not limited to: (i) name, (ii) signature, (iii) photograph, (iv) image, (v) likeness, or (vi) voice." 765 ILCS 1075/5.

19. The IRPA provides for, *inter alia*, statutory damages of $1,000.00 per violation, as well as recovery of any profits attributable to the unauthorized use of the person's name or likeness. *See* 765 ILCS 1075/40.

20. As explained below, Defendant disregarded its legal responsibilities to Plaintiffs Ambrosia and Weintraub and many thousands of other individuals by using their names to advertise and promote its own products and services services—in direct violation of the IRPA.

## FACTUAL BACKGROUND

21. As the operator of an online platform used by "millions of patients," Defendant has built a lucrative business centered around selling appointment-booking and patient intake tools to medical providers.[1]

22. Defendant has compiled a vast database of the names and personally identifying information of nearly all physicians, nurse practitioners, and physician assistants in the United States.

23. According to Defendant, over 3.5 million medical professionals are listed on the Website.[2]

24. Defendant uses the names, identities, and personal details of the medical professionals in its database to advertise its own products and services—even when those people have never provided Defendant consent to do so.

25. Defendant does this by publishing and disseminating hundreds of thousands of "profile pages" on the Website. Each profile page prominently features the name, identity, and personally identifying details of one medical professional and uses each such medical professional's name and identity to advertise Defendant's own products and services.

---

[1] Phreesia, "MediFind" available at https://www.phreesia.com/medifind/.

[2] MediFind, available at https://www.medifind.com/.

26. Defendant disseminated each of the profile pages in Illinois.

## I. Defendant's Products and Services

27. Defendant acquired Comsort, Inc. d/b/a MediFind on July 14, 2023, and is now the owner and operator of the Website.[3]

28. Defendant operates a classic online "two-sided platform" business model through the Website.[4]

29. Defendant uses the Website to both (1) build a broad base of internet users and medical patients and (2) sell appointment booking and patient intake tools to medical providers who wish to secure medical appointments with the internet users and medical patients who use the Website.

30. As a result, the internet users and medical patients who utilize the free products and services on Defendant's Website are immensely valuable to

---

[3] Phreesia, Inc., Form 10-K "Annual Report," March 31, 2026, page 105, available at https://ir.phreesia.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=19305285.

[4] *See, e.g.*, Sunil Gupta and Carl F. Mela, *Harvard Business Review,* "What Is a Free Customer Worth?" (Nov. 2008) ("Customers who pay little or nothing and are subsidized by another set of customers are essential to a vast array of businesses . . . According to one estimate, this business model accounts for a majority of the revenues of 60 of the world's 100 largest companies . . . The rationale for this approach, of course, is that by charging one set of customers little or nothing, the business will attract the critical mass of them required to draw in large numbers of another set of customers, and the income generated by the latter will handsomely exceed the cost of acquiring and serving the former.").

Defendant. They are critical to Defendant's ability to make money through the platform, because they permit Defendant's paying customers (e.g., medical providers) to obtain new patients through the platform. Without the internet users and medical patients using the Website, Defendant could not sell its appointment booking and patient intake products and services.

31. To attract users of its platform, Defendant publishes hundreds of thousands of profile pages on the Website. Each such profile pages corresponds to the identity of a single medical professional (e.g., a physician, nurse, or physician assistant). Defendant holds out the names and identities of these medical professionals to attract the attention internet users who are looking for information aboutthem. On the profile pages, Defendant uses the names and identities of these medical professionals to advertise and promote its own products and services, thereby increasing its user base and burnishing its bottom line.

**A. The First "Side" of Defendant's "Two-Sided Platform"**

32. On the first "side" of Defendant's "two-sided platform" business model, Defendant offers medical patients and internet users various products and services related to researching medical providers.

33. Defendant offers these free-to-use products and services to build a wide user base of medical patients and internet users. This user base is essential to

Defendant's ability to sell appointment-booking and patient intake tools to medical providers on the second "side" of its "two-sided platform" business model.

34. *First*, Defendant offers internet users ability to register for a free account on the Website and to thereby save lists of medical providers who treat certain conditions or are located in a certain geographic area.

35. Internet users who create a free account on the Website gain access to certain products, services, and features which are exclusively available to internet users who are registered for such an account.

36. As Defendant explains on the Website:[5]

[5] MediFind, "Frequently Asked Questions," available at: https://www.medifind.com/faq.

**Is there a cost?**

There is no cost to use MediFind, however registration may be required to view certain elements of the application.

**Is registration required?**

Registration is not required to use MediFind. To gain full access to all of the application's features, such as saving conditions and bookmarking doctors, you will need to register. By registering with MediFind, we will be able to send you notifications about new research and latest research in conditions of interest to you.

37. For example, creating a free account enables internet users to "Bookmark" certain medical professionals (e.g., to "save" them for later).

38. As shown in the screenshot below, registered users can access their "Bookmarks" of saved medical providers on the Website. Registered users can sort their "Bookmarked" providers by condition treated, procedure performed, or type of medical professional. Only registered users of the Website have access to this type of "Bookmarks" functionality.




39. Defendant describes the "Bookmarks" service as follows:[6]

6 MediFind, "Frequently Asked Questions," available at: https://www.medifind.com/faq.

> **What does it mean to bookmark something?**
>
> In order to use the bookmarking feature, you must be logged into MediFind. Clicking on the Bookmark icon allows you to save a doctor, an article, or a clinical trial so that when you come back later all of the information you saved will be easy to find. All of your bookmarks will appear in the Dashboard section of the condition for which they were saved.

40. The free accounts Defendant offers to consumers are both a product and a service it offers to consumers through the Website.

41. Similarly, the "Bookmarks" feature is both a product and service that Defendant offers to consumers through the Website.

42. *Second*, Defendant provides a "Find a Second Opinion" feature to internet users, medical patients, and consumers through the Website.

43. The "Find a Second Opinion" feature is both a product and service offered by Defendant to consumers through the Website.

44. As shown below, the "Find a Second Opinion" tool asks internet users for their current doctor, diagnosed health condition, and location:[7]

---

[7] MediFind, "Find a Second Opinion," available at: https://www.medifind.com/second-opinion/search?personId=221700539.




45. When an internet user clicks the "Next" button after entering this information, they are provided a list of medical professionals who purportedly treat the medical condition selected by the user, who are located the user's area, and who have "claimed" their MediFind profile.

46. Users are prompted to save the list of medical professionals for later through a "Save" button which appears on the results page which, when clicked, encourages users to create a free account on the Website.

47. Defendant describes the "Find a Second Opinion" service on its Website in the following terms:[8]

> **What is the Second Opinion feature?**
>
> There are many different schools of thought when it comes to treating diseases and illnesses. The Second Opinion feature allows you to find new doctors to evaluate your condition. Our algorithms look for doctors with similar characteristics to the doctor you have selected, but with different enough viewpoints to provide alternative options for your care.

48. Third, Defendant provides a "Symptom Checker" feature.

49. The "Symptom Checker" is both a product and service Defendant offers to consumers on the Website.[9]

50. The "Symptom Checker" asks users a series of personal health questions, including their symptoms, health history, age, and location.

---

[8] MediFind, "Frequently Asked Questions," available at: https://www.medifind.com/faq.

[9] MediFind, "Symptom Checker", available at: https://www.medifind.com/symptom-checker.

51. The "Symptom Checker" then produces a list of "Possible Causes," which users can save for later through the platform by creating a free account on the Website. Users are prompted to create such an account through buttons stating "Save" and "Save Your Results for Later" on the results page. Only registered users with an account on the Website can save their results for later.

52. The "Symptom Checker" also produces a list of medical professionals who treat the "Possible Causes" of the symptoms that the internet user described, who are located in the internet user's area and who have "claimed" their MediFind profile page.

53. Users are prompted to save these medical providers for later through a button stating "Save," text stating "Save doctors for later," and a button stating "Sign Up on the page which displays the list of doctors. Only registered users with an account on the Website can save these medical professionals for later.

54. As described above, Defendant offers the forgoing products and services (the free accounts, the "Bookmarks" feature, the "Find a Second Opinion" feature, and the "Symptom Checker" feature) to internet users on the Website.[10]

---

[10] *See* Phreesia, Inc., Form 10-K "Annual Report," March 31, 2026, page 56, available at https://ir.phreesia.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=19305285 ("MediFind is a consumer-facing healthcare product . . . .").

**B. The Second "Side" of Defendant's "Two-Sided Platform"**

55. On the second "side" of its "two-sided" business model, Defendant sells appointment booking and patient intake tools to medical providers.

56. As Defendant states in its SEC filings, among its "Key capabilities" are "care discovery and scheduling through MediFind."[11]

57. Medical providers pay for Defendant's appointment booking services in order to access the wide audience of medical patients and internet users Defendant attracts to Website through the products and services (e.g., the free accounts, the "Bookmarks" feature, the "Find a Second Opinion" feature, and the "Symptom Checker" feature) it offers on the first "side" of its "two-sided platform."

58. Defendant's appointment booking and patient intake services allow internet users and medical patients to schedule appointments with medical providers online directly through the Website.

59. Medical providers pay Defendant for the ability to have medical patients and internet users book appointments directly through the profile pages which those medical providers have "claimed" on the Website.

---

[11] Phreesia, Inc., Form 10-K "Annual Report," March 31, 2026, page 56, available at https://ir.phreesia.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=19305285.

60. Defendant promotes this service to its potential paying customers online, stating: "Over a million patients search MediFind every month. With your profile linked to Phreesia's scheduling, they don't just find you—they book you."[12]

61. Defendant further states: "Phreesia users can enable an appointment request form on their MediFind profiles or conveniently link directly to our self-scheduling platform—an easy and cost-effective way to acquire new patients."[13]

62. This direct-booking service provided through the Website is only available to Defendant's paying customers. Defendant states: "Millions of doctors are listed on MediFind, but only providers that use Phreesia can receive appointment requests from MediFind directly within their Appointments Hub."[14]

63. Defendant actively promotes the importance of MediFind to the appointment booking services it sells, stating:

> One more thing! Remember how we said MediFind is more powerful when you pair it with Phreesia? This is where it really shines: Phreesia clients can add an appointment request form to their providers' MediFind pages. That means when a prospective patient requests an

[12] Phreesia, "Grow Patient Volume and Reduce No Shows," available at: https://www.phreesia.com/see-more-patients/.

[13] Phreesia, "Get found and chosen by the right patients," available at: https://www.phreesia.com/medifind/#request-a-demo.

[14] Phreesia, "Long-Term Success: How to Operate a Profitable Practice," available at: https://www.phreesia.com/resources/operate-a-profitable-practice/.

appointment from MediFind, it will automatically appear in your Appointments Hub.[15]

64. Defendant's paying customers have a "Request Appointment" button on their profile pages which does not exist on the profile pages of medical providers who have not purchased Defendant's services.

65. Medical providers paying for Defendant's services also "show up higher in MediFind search results, making it easier for them to get found and chosen by the 1M+ patients who use MediFind every month."[16]

66. Medical providers paying for Defendant's services "may also appear in one of the two positions at the top of the results page, and are labeled as 'featured'" on the search results pages which appear on the Website.[17]

67. This business model has proven immensely lucrative for Defendant. For the fiscal year ended on March 31, 2025, Defendant reported $480.6 million in annual revenue.[18]

---

[15] Phreesia, "Long-Term Success: How to Operate a Profitable Practice," available at: https://www.phreesia.com/resources/operate-a-profitable-practice/.

[16] Phreesia, "Long-Term Success: How to Operate a Profitable Practice," available at: https://www.phreesia.com/resources/operate-a-profitable-practice/.

[17] MediFind, "Frequently Asked Questions," available at: https://www.medifind.com/faq.

[18] Phreesia, Inc., Form 10-K "Annual Report," March 31, 2026, available at https://ir.phreesia.com/financials/sec-filings/sec-filings-details/default.aspx?FilingId=19305285.

## II. Defendant Uses Plaintiffs' and the Class Members' Names and Identities to Advertise Its Own Products and Services.

68. Defendant has created, published, and disseminated hundreds of thousands of profile pages, each of which uses a different medical professionals' name, identity, and personally identifying information to advertise Defendant's own products and services.

69. Defendant has neither requested nor obtained consent from many of the medical professionals whose names, identities, and other personal details it misappropriates on these profile pages.

70. Defendant disseminates these profile pages in Illinois and intentionally directs them towards individuals located in Illinois.

### A. Plaintiff Victor Ambrosia's Profile Page

71. Plaintiff Victor Ambrosia is a physician assistant in Arlington Heights, Illinois.

72. The profile page created by Defendant regarding Plaintiff Victor Ambrosia ("Plaintiff Ambrosia's Profile Page")[19] is representative of the hundreds

---

[19] *See* MediFind, "Victor L. Ambrosia | Physician Assistant | Arlington Heights, IL | MediFind," available at https://www.medifind.com/doctors/victor-l-ambrosia/11157293.

of thousands of similar such pages (including those corresponding to Plaintiff Weintraub[20] and all Class members) published by Defendant on the Website.

73. Like the other profile pages created, published, and disseminated by Defendant, Plaintiff Ambrosia's Profile Page uses his name, identity, and personally identifying information to advertise Defendant's products and services.

74. Plaintiff Ambrosia has never registered for Defendant's Website nor provided Defendant consent to use his name or identity in any manner, much less for the commercial purpose of advertising Defendant's own products and services.

75. Plaintiff Ambrosia's name and location are featured in the title of the page, which is: "Victor L. Ambrosia | Physician Assistant | Arlington Heights, IL | MediFind." This is a standard title format, replicated across all profile pages published by Defendant, with the only changes between profile pages being the name of the medical professional, his or her job title, and his or her location.

[20] Like all Class members, Plaintiff Weintraub has a profile page that is functionally identical to Plaintiff Ambrosia's Profile Page, except that it displays her name, job title, personal details, and location. *See* MediFind, "Barbara A. Weintraub | Nurse Practitioner | Glenview, IL | MediFind," available at https://www.medifind.com/doctors/barbara-a-weintraub/9635720 ("Plaintiff Weintraub's Profile Page").

76. An excerpt of Plaintiff Ambrosia's Profile Page is reproduced in the screenshot below[21]:

[21] *See* MediFind, "Victor L. Ambrosia | Physician Assistant | Arlington Heights, IL | MediFind," available at https://www.medifind.com/doctors/victor-l-ambrosia/11157293.

MediFind

Home > Physician Assistants Doctors in Arlington Heights, IL > Victor L. Ambrosia, PA

Save Share

# Victor L. Ambrosia, PA

Physician Assistant

800 W Central Rd, Arlington Heights, IL (614.8 miles away)

Call: 847-618-3040

Overview Insurance Locations Similar Doctors FAQ

## Overview

Victor Ambrosia is a Physician Assistant practicing medicine in Arlington Heights, Illinois.

**Specialties**
Physician Assistant

**Licenses**
Physician Assistant in IL

**Languages Spoken**
English

**Gender**
Male

## Insurance

Accepted insurance can change. Please verify directly with the provider.

**Find your insurance**

Enter insurance carrier

**Accepted insurance plans:**

Health Care Services Corporation +

## Locations

800 W Central Rd, Arlington Heights, IL 60005

Call: 847-618-3040




## Similar Doctors

## Areas of Expertise

MediFind evaluates expertise by pulling from factors such as number of articles a doctor has published in medical journals, participation in clinical trials, speaking at industry conferences, prescribing and referral patterns, and strength of connections with other experts in their field.

Learn more about MediFind's expert tiers →

**Find Ambrosia, PA's expertise for a condition**

Enter your condition or procedu...

We do not have enough information to identify the Areas of Expertise for this provider.

**Want to save this doctor for later?**

Sign Up

**Is this your doctor?**

Find A Second Opinion

**Not sure about your diagnosis?**

Check Your Symptoms

**Learn about our expert tiers**

Learn More

**Are you the provider on this profile?**

Claim Profile

77. As shown above, Plaintiff's Ambrosia's Profile Page prominently displays his name, professional certification, job title, work location, work address, and work phone number alongside statements and links advertising Defendant's products and services.

78. Plaintiff's name and professional certifications are the most prominently-displayed text on the page—they appear in the largest font and near the top of the page.

79. Below the header, the page states in the overview section: "Victor Ambrosia is a Physician Assistant practicing medicine in Arlington Heights, Illinois." Below this, the page lists Plaintiff's specialties, licenses, languages spoken, and gender.

80. On the lower right-hand side of the page are a series of white boxes set off against a grey background with text and clickable buttons which advertise Defendant's products and services, as shown below:




81. The first box advertises accounts for Defendant's platform and the "Bookmarks" feature. It states: "Want to save this doctor for later?" and includes a clickable button displaying the text "Sign Up." When clicked, this button sends users to a page where they are prompted to create a MediFind account.

82. The second box advertises Defendant's "Find a Second Opinion" service. It states: "Is this your doctor?" and includes a clickable button displaying

the text "Find a Second Opinion." When clicked, this button sends users to the page hosting the "Find a Second Opinion" service.

83. The third box advertises Defendant's "Symptom Checker" service. It states: "Not sure about your diagnosis?" and includes a clickable button displaying the text "Check Your Symptoms." When clicked, this button sends users to the page hosting the "Symptom Checker" service.

84. Another clickable button on the page displays the text "Claim Profile" below the question "Are you the provider on this profile?" When clicked, the "Claim Profile" button leads to a separate page which encourages website users to "claim [their] profile," as shown below[22]:

[22] *See* Doximity, "Doximity –Sign Up – Search," available at https://www.doximity.com/onboarding/registration/default/users/search.




85. Neither Plaintiff Ambrosia nor Plaintiff Weintraub have "claimed" the profile page corresponding to their name and identity which was published by Defendant on the Website.

86. No level of "expertise" (e.g., "Elite," "Distinguished," "Advanced," "Experienced") appears on Plaintiff Ambrosia's Profile Page. Instead, it states: "We do not have enough information to identify the Areas of Expertise for this provider."

87. No level of "expertise" (e.g., "Elite," "Distinguished," "Advanced," "Experienced") appears on Plaintiff Weintraub's Profile Page. Instead, it states: "We do not have enough information to identify the Areas of Expertise for this provider."

88. Plaintiff Ambrosia's Profile Page is a singular publication which uses Plaintiff Ambrosia's name and identity for the purpose of advertising and promoting Defendant's own products and services.

89. Plaintiff Weintraub's Profile Page is a singular publication which uses Plaintiff Weintraub's name and identity for the purpose of advertising and promoting Defendant's own products and services.

90. Defendant's motive in publishing Plaintiff Ambrosia's Profile Page, Plaintiff Weintraub's Profile Page, and the hundreds of thousands of other profile pages on the Website was to use the names and identities of the medical professionals for whom it has published such profile pages to attract users to its Website, advertise the products and services it offers to consumers, leverage those products and services to increase the number of individuals using the Website to locate medical providers, and then sell appointment booking services to medical providers who wish to generate new appointments from among those internet users.

91. Defendant intentionally used Plaintiff Ambrosia's, Plaintiff Weintraub's and hundreds of thousands of other medical professionals' names and identities to advertise its own products.

92. Defendant never requested or obtained consent from Plaintiff Ambrosia, Plaintiff Weintraub, or any other member of the Class to use their names, or identities to advertise its own products and services.

### III. Defendant Uses Plaintiff Ambrosia's, Plaintiff Weintraub's, and the Class Members' Names in Search Engine Optimization Techniques on Their Profile Pages to Advertise Its Own Products and Services

93. Defendant intentionally uses Plaintiff Ambrosia's name, Plaintiff Weintraub's name, and the names of hundreds of thousands of other medical professionals whose identities it has misappropriated in search engine optimization ("SEO") techniques built into the profile pages.

94. Defendant uses these names in SEO techniques in order to trade on the commercial value associated with the names. Defendant's goal is to attract internet users who are searching for these individuals' names to Defendants' advertisements for its own products and services appearing on the profile pages.

95. Specifically, Defendant uses the names in this manner to ensure that the profile pages rank highly in search engine results whenever someone searches for the corresponding individual's name—and to thereby more effectively advertise Defendant's own products and services.

96. Defendant uses these names in following specific SEO techniques on each profile page:

- **Placing the medical provider's name in the page's URL.** For example, Plaintiff Ambrosia's name appears in the URL for Plaintiff Ambrosia's Profile Page[23]:




- **Placing the medical provider's name in the page's title.** For example, Plaintiff Ambrosia's name appears in the page title for Plaintiff Ambrosia's Profile Page, which is entitled "Victor L. Ambrosia | Physician Assistant | Arlington Heights, IL | MediFind"[24]:




This page title is reflected in the following line of Plaintiff Ambrosia's Profile Page's html source code: <title>Victor L. Ambrosia | Physician Assistant | Arlington Heights, IL | MediFind</title>

---

[23] MediFind, "Victor L. Ambrosia | Physician Assistant | Arlington Heights, IL | MediFind," available at https://www.medifind.com/doctors/victor-l-ambrosia/11157293.

[24] *Id.*

- **Placing the medical provider's full name on the page multiple times.** For example, Plaintiff Ambrosia's name appears on Plaintiff's Ambrosia's Profile Page nine separate times.
- **Placing the medical provider's name in the page's headers.** For example, Plaintiff Ambrosia's name appears in the first-level "header" on Plaintiff Ambrosia's Profile Page.[25] This is reflected on the face of the page and in the following line of the page's source code: <h1 class="doctors-single_name__vfOHL"><span class="doctors-single_text__qTgfv">Victor L. Ambrosia, PA</span><span class="doctors-single_name__tick__-WI3a"></span></h1>
- **Placing the medical provider's name in the meta 'description' tag of the page's source code.** A 'description' meta tag is a piece of code placed on a website which structures search engines' understanding of the content on the page. Defendant's use of medical provider' names in this technique ensures that search engines pick up the names when indexing pages and display the page in results generated in response to

[25] *See* Amelia Willson, Search Engine Journal, *How To Use Header Tags: SEO Best Practices* (May 31, 2024), available at https://www.searchenginejournal.com/on-page-seo/header-tags/.

queries including the name.[26] The 'description' meta tag is reflected in the following line of the source code on Plaintiff Ambrosia's Profile Page:

```
<meta name="description" content="Victor Ambrosia is a Physician Assistant practicing medicine in Arlington Heights, Illinois." data-react-helmet="true">
```

- **Placing the medical provider's name in Schema.org descriptors.** Including the medical professionals' names in Schema.org descriptors embedded in the pages' source code ensures that search engines recognize the names as names, and are able to calibrate search engine results accordingly.[27] The Schema.org descriptors are reflected in the following line of the source code on Plaintiff Ambrosia's Profile Page:

---

[26] *See, e.g.*, Google Search Central, "Meta Tags and Attributes that Google Supports," available at https://developers.google.com/search/docs/crawling-indexing/special-tags (explaining "meta tags are HTML tags used to provide additional information about a page to search engines and other clients.") (also stating with respect to the 'description' meta tag: "Use this tag to provide a short description of the page. In some situations, this description is used in the snippet shown in search results.").

[27] *See* Schema.org, *Getting started with schema.org using Microdata*, available at https://schema.org/docs/gs.html. Schema.org descriptors are used solely for the purpose of improving the search engine optimization of a webpage.

{"@context":"http://schema.org/","@type":"Physician","name":"Victor L. Ambrosia","description":"Victor Ambrosia is a Physician Assistant practicing medicine in Arlington Heights, Illinois.","url":"https://www.medifind.com/doctors/victor-l-ambrosia/11157293","address":{"@type":"PostalAddress","addressLocality":"Arlington Heights","addressRegion":"IL","postalCode":"60005","streetAddress":"800 W Central Rd","addressCountry":"US"},"medicalSpecialty":{"@type":"MedicalSpecialty","name":"Physician Assistant","url":"https://www.medifind.com/specialty/physician-assistant"},"telephone":"847-618-3040"}

- **Placing multiple variants of the medical provider's name on the page.** A website's use of common variants of a keyword phrase aids search engines in connecting different uses of that phrase to others (this is sometimes referred to as "keyword stemming" or "keyword phrase

stemming").[28] For example, Plaintiff Ambrosia's Profile Page uses three different various of his name: "Victor L. Ambrosia", "Victor Ambrosia," and "Ambrosia."

97. Defendant's use of these SEO techniques reflects an intentional choice by Defendant to hold out Plaintiff Ambrosia's name in search engines for the commercial purpose of trading on the value associated with their name.

98. Defendant's use of Plaintiff Ambrosia's name in these many SEO techniques is designed to attract internet users who are searching for him by name to the advertisements published by Defendant for its own products and services on Plaintiff Ambrosia's Profile Page.

99. Through each of these SEO techniques, Defendant intended to optimize the ranking of the profile pages in search engine results (e.g., in the results generated by a query on google.com) when any user searches for the name of any individual for whom Defendant has built a profile page.

---

[28] *See* Topic Ranker Blog, *Yes, SEO Keywords Can Be Phrases (12 Best Examples)* (Oct. 17, 2024) ("Don't limit yourself to exact match keywords. Search engines have evolved to understand the intent behind queries, so optimizing for related phrases and synonyms can help you capture a wider range of relevant traffic."); *see also id*. ("Weave your target keyword phrases naturally into important on-page elements such as page titles, headings (H1, H2, etc.), body copy, and meta descriptions.")

100. Defendant could have easily prevented the profile pages from appearing in search engine results by adding a "noindex" directive to the pages' source code.[29] Defendant chose not to.

101. During the time period relevant to this action, numerous non-subscribers to Defendant's services performed searches on Google and other search engines that yielded results including hyperlinks to Plaintiff Ambrosia's Profile Page and Plaintiff Weintraub's Profile Page, along with summaries of the information available on the profile page in the search-engine results themselves (including Plaintiffs' names and other personally identifying information).

102. During the time period relevant to this action, numerous non-subscribers to Defendant's services visited Plaintiff Ambrosia's Profile Page and Plaintiff Weintraub's Profile Page by clicking on a link to such page in the results page of a search performed on Google or another search engine.

103. During the time period relevant to this action, numerous non-subscribers to Defendant's services bore witness to the Defendant's use of Plaintiff Ambrosia's name on Plaintiff Ambrosia's Profile Page and Plaintiff Weintraub's

---

[29] A "noindex" directive is a piece of code on the page that instructs search engines not to index the page. *See* Google Search Central, *Block Search indexing with noindex*, available at https://developers.google.com/search/docs/crawling-indexing/block-indexing.

name on Plaintiff Weintraub's Profile Page to advertise Defendants' products and services and gain a commercial advantage.

104. Defendant tracks, *inter alia*, the number of times when (by date and time) and from where (by, *inter alia*, IP address) each of each profile pages is viewed by a non-subscriber, the location from which the visitor to the page originated (such as a Google search results page), and the total numbers of persons who have visited a particular profile page.

105. Defendant continues to improve the coding of the profile pages to maximize their visibility to the consuming public in the results yielded by searches on Google and other popular search engines, and employ persons (and work with contractors) who focus specifically on these efforts.

## CLASS ACTION ALLEGATIONS

106. Plaintiff Ambrosia's Profile Page is representative of the hundreds of thousands of unclaimed profile pages disseminated by Defendant in Illinois and corresponding to medical professionals residing in Illinois, including those corresponding to the identities of Plaintiff Weintraub and all members of the Class.

107. Pursuant to Federal Rule of Civil Procedure 23(b)(1), 23(b)(2), 23(b)(3), and where applicable, 23(c)(4), Plaintiffs bring this action, on behalf of themselves and members of the "Class" defined as follows:

> All natural persons residing in the state of Illinois for whom Defendant established a profile page on MediFind.com and who have not created an account on MediFind.com.

108. Excluded from the Class are Defendant's officers, directors, and employees; any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Also excluded from the Class are members of the judiciary to whom this case is assigned, their families, and members of their staff.

109. Plaintiffs reserve the right to modify the definitions of the Class, including based on discovery and further investigation.

110. The members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiffs are informed and believe, and thereupon allege, that the members of the Class number in the tens of thousands or higher. The precise number of members of the Class and their identities are unknown to Plaintiffs at this time but will be readily determined in discovery, including by reference to Defendant's records. Members of the Class may be notified of the pendency of this action by email, mail and/or publication through the records of Defendant.

111. Plaintiffs' claims are typical of the claims of the members of the Class they seeks to represent in that Plaintiffs and all members of the Class were injured and sustained damages by Defendant's uniform wrongful conduct—namely,

Defendant's practices of using Plaintiffs' and the Class members' names, identities, and personally identifying information to advertise, sell, and promote, and to solicit sales of its products and services, without any of their consent.

112. Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members. Legal and factual questions common to the Class include, but are not limited to:

a. Whether Defendant engaged in the alleged conduct;

b. Whether Defendant knowingly used the names and personally identifying information of the members of the Class;

c. Whether Defendant used the Class members' names and identities for the purposes of advertising goods or services;

d. Whether Defendant used the Class members' names and identities for the purposes of promoting goods or services;

e. Whether Defendant had the Class members' consent to use their names and personally identifying information in this way;

f. Whether members of the Class are entitled to recover statutory damages;

g. Whether members of the Class are entitled to equitable relief, including injunctive relief.

113. Plaintiffs are adequate representatives of the Class because Plaintiffs' interests do not conflict with the interests of the other members of the Class they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

114. The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Class. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of such issues.

## FIRST CLAIM FOR RELIEF
## Violation of the Illinois Right of Publicity Act, 765 ILCS 1075

**(By Plaintiffs Ambrosia and Weintraub, Individually and On Behalf of the Class)**

115. Plaintiffs Ambrosia and Weintraub, individually and on behalf of the Class, repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

116. Defendant is a corporation and thus a juristic "person" within the meaning of the IRPA. *See* 765 ILCS 1075/5.

117. During the time period relevant to this action, Defendant publicly used the names, identities, and other personally identifying attributes of Plaintiffs and the Class members in the manner alleged herein, including by using such names, identities, and other personally identifying information on profile pages to advertise Defendant's own products and services, including its free accounts, its "Bookmarks" feature, its "Find a Second Opinion" tool, and its "Symptom Checker" service.

118. Defendant promoted its own products and services (including its free accounts, "Bookmarks" feature, "Find a Second Opinion" tool, and "Symptom Checker" service) on Plaintiffs' and the Class members' profile pages in order to increase the number of internet users searching for medical providers through the Website and thereby increase the value of the appointment booking and patient intake services that it sells to medical providers.

119. Defendant's use of Plaintiffs and the Class members' names, identities, and personally identifying information on the profile pages and in SEO techniques

on those pages constitutes a "use" or "holding out" of those identities "in connection with the offering for sale or sale of a product, merchandise, goods, or services" or "for purposes of advertising or promoting products, merchandise, goods, or services" within the meaning of "commercial purposes" as it is defined in the IRPA. *See* 765 ILCS 1075/5.

120. Defendant's free accounts, "Bookmarks" feature, "Find a Second Opinion" tool, and "Symptom Checker" service, constitute "product[s], merchandise, goods, or services" within the meaning of the IRPA. *See id.*

121. Defendant has published and disseminated the profile pages in Illinois.

122. Prior to using and holding out Plaintiffs' and the Class members' names and other personally identifying information for advertising purposes in the manner alleged herein, Defendant did not notify Plaintiffs nor any member of the Class that it would do so, and neither Plaintiffs nor any member of the Class has ever consented (in writing or otherwise) to Defendant doing so.

123. By using Plaintiffs' and the Class members' names, identities, and other personally identifying information to advertise its products and services, without their prior consent, Defendant infringed upon Plaintiffs' and the Class members' rights of publicity in violation of the IRPA.

124. Significant commercial value exists in the aspects of Plaintiffs' and the other Class members' names and identities that Defendant used and continues to use in the manner alleged herein.

125. Defendant's use of Plaintiffs' and the Class members' names, identities, and other personally identifying information in the profile pages was not incidental. On the contrary, it was instrumental (and continues to be instrumental) to Defendant in attracting users to the Website and obtaining paying customers. This is demonstrated by the sheer volume of profile pages published by Defendant on the Website.

126. On behalf of themselves and the Class, Plaintiffs seek: (1) an injunction requiring Defendant to obtain prior consent from the Class members prior to the use of their names and identities to advertise products or services; (2) $1,000.00 in statutory liquidated damages to Plaintiffs and each Class member; and (3) costs and reasonable attorneys' fees. *See* 765 ILCS 1075/40; 765 ILCS 1075/50.

## SECOND CLAIM FOR RELIEF
**Unjust Enrichment**
**(By Plaintiffs Ambrosia and Weintraub, Individually and On Behalf of the Class)**

127. Plaintiffs repeat and incorporate by reference each preceding paragraph as if fully stated herein.

128. Defendant has wrongfully and unlawfully used Plaintiffs' and the Class members' names, identities, and other personal identifying information for

the commercial purpose of advertising its own products and services without their consent for substantial profits.

129. Plaintiffs' and the Class members' names, identities, and personal information have conferred an economic benefit on Defendant.

130. Defendant has been unjustly enriched at the expense of Plaintiffs and the Class members, and the company has unjustly retained the benefits of its unlawful and wrongful conduct.

131. It would be inequitable and unjust for Defendant to be permitted to retain any of the unlawful proceeds resulting from its unlawful and wrongful conduct.

132. Plaintiffs and the Class members accordingly are entitled to equitable relief including restitution and disgorgement of all revenues, earnings, and profits that Defendant obtained as a result of its unlawful and wrongful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of the members of the Class, as follows:

A. For an order certifying the Class pursuant to Federal Rule of Civil Procedure 23 and naming Plaintiffs Ambrosia and Weintraub as representatives of the Class and Plaintiffs' undersigned attorneys as counsel to represent the Class;

B. For an order entering judgment in favor of Plaintiffs and the members of the Class on all claims for relief stated herein;

C. For an order awarding Plaintiffs and the members of the Class actual damages, compensatory damages, punitive damages, statutory damages, and statutory penalties, in the amounts set by statute or to be proven at trial;

D. For an order for appropriate injunctive relief;

E. For an order awarding pre- and post-judgment interest according to law; and

F. For an award of attorneys' fees, costs and expenses to Plaintiffs' counsel.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and members of the Class, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all claims and issues so triable.

Dated: October 18, 2026

Respectfully submitted,

By: /s/ *Frank S. Hedin*

**HEDIN LLP**
FRANK S. HEDIN
1395 Brickell Ave, Suite 610
Miami, Florida 33131
Telephone: (305) 357-2107
E-Mail: fhedin@hedinllp.com

**HEDIN LLP**
TYLER K. SOMES
1100 15th Street NW, Ste 04-105K
Washington, D.C. 20005
Telephone: (202) 900-3332
Facsimile: (305) 200-8801
tsomes@hedinllp.com

*Counsel for Plaintiff and the Putative Classes*